1   WO

2

3

4

5

6

7                    **IN THE UNITED STATES DISTRICT COURT**

8                    **FOR THE DISTRICT OF ARIZONA**

9

10  Lupita Lopez, et al.,                          No. CV-12-00414-TUC-BPV

11                    Plaintiffs,                   **ORDER**

12  v.

13  MauiSun Computer Systems Incorporated,
    et. al.,
14                    Defendants.

15

16

17        Pending before the Court are: (1) Plaintiff Maria E. Cornejo's Motion for Partial

18  Summary Judgement as to Liability on Her Two Claims (Doc. 214) ("MPSJ"); and (2)

19  Defendant MauiSun's Cross-Motion for Partial Summary Judgment Against Plaintiff

20  Cornejo (Doc. 216) ("XMPSJ").[1]  The Magistrate Judge has jurisdiction over this matter

21  pursuant to the parties' consent.  (Doc. 16). *See* 28 U.S.C. § 636(c).

22        The pending motions came on for oral argument on September 8, 2016.  For the

23  following reasons, the Court denies both motions and sets this matter for trial.

24  _____

25        [1] In 2015, Defendant MauiSun Computer Systems, Inc. ("MauiSun") and Plaintiff

26  Cornejo filed cross-motions for partial summary judgment that were ultimately denied
    without prejudice with leave to renew due to the filing of a Second Amended Complaint,
27  which among other things, added new defendants.  (*See* Docs. 152, 167, 205)  In the
    pending XMPSJ, MauiSun relies upon its statements of facts filed in 2015.  In resolving
28  the pending cross-motions for partial summary judgment, the Court considers MauiSun's
    and Cornejo's statements of facts and controverting statements of facts filed in 2015 in
    support of their previous cross-motions.

## I.   BACKGROUND

Plaintiffs Maria E. Cornejo and Yareli Sierra[2] have filed a Second Amended Complaint ("SAC") against Defendants MauiSun, FreedomSmoke USA, Inc., and FreedomSmoke USA I, Inc., alleging:  (1) workplace sexual harassment in violation of 42 U.S.C. § 2000e-2(a) (Counts 1 (Cornejo), 3 (Sierra)); and (2)  retaliation in violation of 42 U.S.C. §2000e-3(a) (Counts 2 (Cornejo), 4 (Sierra)).  (SAC (Doc. 208)).  Plaintiffs also allege successor liability with regard to both FreedomSmoke Defendants.  (*Id.* at ¶¶ 45-66).  Prior to filing this action, Plaintiffs filed charges with the Arizona Civil Rights Division ("ACRD") and, after an investigation, the ACRD issued a reasonable cause determination finding there was reasonable cause to believe that unlawful discrimination had occurred with regard to each Plaintiff. (*See id.* at Exhs. 1-4).

## II.   DISCUSSION

Cornejo moves for partial summary judgment as to liability with regard to her claims of workplace sexual harassment and retaliation.  Although Cornejo initially sought partial summary judgment on the issue of successor liability with regard to the FreedomSmoke Defendants, she concedes that a genuine issue of material fact precludes entry of summary judgment on this issue. (Cornejo's Reply (Doc. 219, p. 2)).  Therefore, Cornejo seeks partial summary judgment with regard to Defendant MauiSun only.  (*Id.*).

MauiSun seeks partial summary judgment with regard to Cornejo's claim of sexual harassment only.  (MauiSun's XMPSJ (Doc. 216, p. 1)).

### A.   STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing

---

[2] This action was originally filed by two other former employees of MauiSun in addition to Plaintiffs Cornejo and Sierra:  Giovanni Brown, whose claims were ultimately dismissed without prejudice for lack of prosecution (*see* Doc. 113); and Lupita Lopez, who stipulated to dismissal after "having reached a resolution of the disputed claims. . . ." (Doc. 212).  (*See* Docs. 1 (Complaint), 9 (First Amended Complaint)).  Additionally, Cornejo is Sierra's mother. (*See* Doc. 184-1, Exh. 1, pp.8-9).

the district court of the basis for its motion, and identifying those portions of [the record]...which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party's evidence is presumed true and all reasonable inferences are to be drawn in the light most favorable to that party. *Eisenberg v. Insurance Co. of North Amer.*, 815 F.2d 1285, 1289 (9th Cir. 1987); *Villiarimo v. Aloha Air, Inc.*, 281 F.3d 1054, 1065 n. 10 (9th Cir. 2002).

Only disputes over facts that might affect the outcome of the suit will prevent the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, if the record taken as a whole "could not lead a rational trier of fact to find for the nonmoving party," summary judgment is warranted. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir.2006) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). If the burden of persuasion at trial would be on the nonmoving party, the movant may carry its initial burden of production under Rule 56 by producing, "evidence negating an essential element of the nonmoving party's claim or defense...," or by showing, after suitable discovery, that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1105-1106 (9th Cir. 2000).

The Ninth Circuit instructs that "[w]hen parties file cross-motions for summary judgment, we consider each motion on its merits." *American Tower Corp. v. City of San Diego*, 763 F.3d.1035, 1043 (9th Cir. 2014) (citing *Fair Housing Council of Riverside County, Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001)). Further, the district "court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them." *Fair Housing Council of Riverside County, Inc.*, 249 F.3d at 1134.

**B.**   **EVIDENCE BEFORE THE COURT**

**1.**   **SEXUAL HARASSMENT CLAIM**

At all relevant times, MauiSun manufactured liquids used in e-cigarettes and sold accessories related to electronic cigarettes. (MauiSun's 2015 Statement of Facts in Support of Motion for Partial Summary Judgment against Maria Cornejo (Doc. 153), ¶1; Cornejo's 2015 Statement of Facts (Doc. 168), ¶1). David Dettloff and Pamela Workman-Parker own MauiSun. (Doc. 153, ¶¶2-3; Doc. 168, ¶¶ 2-3).

Cornejo, who was born in 1973, went to work for MauiSun in the shipping department on or about September 15, 2010. (Doc. 153, ¶5; Cornejo's 2016 Statement of Facts in Support of Motion for Partial Summary Judgment (Doc. 215), ¶3; Doc. 215-1, Exh. 1). In October 2010, she was promoted to Human Resources Manager under the direct supervision of Dettloff. (Doc. 153, ¶¶7-8; Doc. 168, ¶¶7-8). Cornejo states in her Declaration in support of her MPSJ, that between October 2010 and June 2011 while she was at work, "Dettloff repeatedly made unwanted and offensive comments of a sexual nature to me, and he stared at parts of my body in a leering and offensive way, often commenting on the size and shape of my breasts. I eventually reported this conduct to the ACRD in connection with filing my charge . . . ." (Doc. 215, ¶8; *see also* Doc. 215-1, Exh. 1 (Cornejo's sworn statement in her ACRD charge that: "During my employment with [MauiSun] and as recent as June 21, 2011, Dettloff subjected me to comments of a sexual nature. Specifically, he would comment about my breasts, and my choice of clothing. I objected to his comments, but Dettloff did not cease.").

According to the ACRD Reasonable Cause determination issued in Cornejo's case, Cornejo testified during the ACRD investigation about the following conduct by Dettloff:

> •   In October, 2010, while Cornejo was in the same room as Sierra and Dettloff, Dettloff told Sierra, who was bent down labeling bottles, "'wow, I thought you were your mom, but by looking at your behind I can tell that

it's not your mom, it's you'[3];" ("Incident 1")

- "Dettloff frequently commented about the clothes worn by female employees, never mentioning anything about his concern that the attire was inappropriate for the work place;" ("Incident 2")

- "On March 1, 2011, when speaking of a medical appointment, Dettloff told Cornejo that he would not be upset if her medical appointment was for a woman's checkup and he could be there for the examination;" ("Incident 3")

- On March, 2, 2011, referencing Cornjeo's breasts, "Dettloff told her they looked like two big juicy oranges he could pick off a tree. Dettloff then made hand motions as if he was squeezing her breasts. Dettloff laughed when [Cornejo] told him to stop[4];" ("Incident 4")

- "On April 5, 2011, while Cornejo was disconnecting a computer cable under her desk, Dettloff walked behind the desk and commented about a tattoo on her lower back, stating that he always wondered how far down back her tattoo went;" ("Incident 5")

- "On April 13, 2011, after Cornejo entered the office after speaking to her boyfriend in the parking lot, Dettloff asked her how much she charged for hanging out in the streets;" ("Incident 6")

- "On April 18, 2011, Cornejo told Dettloff she was leaving work because of a severe headache. Dettloff asked her what a doctor would ask about her headache and then told her the doctor would check her breasts to make her feel better. Dettloff then made squeezing motions with his hands as if he were feeling her breasts;" ("Incident 7")

---

[3] Co-worker and former plaintiff Lupita Lopez also testified before the ACRD that she "witnessed Dettloff tell Sierra, 'oh that's not Maria [Cornejo], look at her butt'". (Doc. 215-1, Exh. 2, p. 3).

[4] Lopez also testified before the ACRD that she heard Dettloff tell Cornejo that Cornejo's breasts "'look like two oranges that [he] could pick.'" (Doc. 215-1, Exh. 2, p. 3).

- "On April 29, 2011, Dettloff tip-toed to the front of Cornejo's desk, looked down her blouse, and told her that he wished he was taller so he could get a better view.  Cornejo testified that she witnessed Dettloff make the same comment to another female coworker;" ("Incident 8")
- "On May 3, 2011, Dettloff stated that he expected all managers to go to Monte Carlo for a meeting, meet at a nude beach, and drink lots of alcohol so they would feel more comfortable"; ("Incident 9")
- "On May 9, 2011, as Cornejo was preparing to leave work, Dettloff saw her adjusting the cloth belt around her waist and told her that if she was going to take her clothes off she would have to stay so he could watch;" ("Incident 10")
- "On June 2, 2011, when Cornejo returned to work after a vacation in Rocky Point, Dettloff told her that he wanted to see her pictures from the weekend so he could see her in a bikini, or better yet, see her without a bikini;" ("Incident 11")
- "On June 2, 2011, Cornejo walked into the room while Dettloff was speaking with a  male coworker about penis size.  Dettloff then told Cornejo, 'I know you don't have a penis but you have two big huge balls' in reference to Cornejo's breasts;" ("Incident 12")
- "On June 21, 2011, as Cornejo walked into the office on a windy day holding her loose fitting dress to keep it from blowing up, Dettloff told her to walk back outside and not hold her dress so he could see what color panties she was wearing.  Dettloff then told her he, if he was lucky, she wouldn't be wearing any panties." ("Incident 13")

(Doc. 215-1, Exh. 2, pp. 2-3; *see also* Doc. 215, ¶¶8, 9).  According to Cornejo, Dettloff's conduct described above "occurred with such frequency and caused such stress that [it] interfered with my ability to concentrate on my job duties.  I often told Dettloff that this conduct was offensive and asked him to cease, but my requests were all ignored,

and he appeared to enjoy harassing me." (Doc. 215, ¶9).

Dettloff, cites his declaration statement submitted during the ACRD investigation, denying that he made "comments to Cornejo about her breasts, although I did occasionally comment on her dress because she seemed to me to be so fashionable. The comments I made about her dress did not contain any sexual references and certainly were not intended to convey any sexual messages."[5] (Doc. 216, p. 3 (citing Doc. 184-1, Exh. 2, internal exh. 5, ¶14 (Dettloff's August 19, 2011 "ACRD declaration"))). Dettloff also submits an August 7, 2015 declaration indicating that "[t]he statements I made in the [ACRD] declaration were true to the best of my knowledge at the time I made them. I did not make any of the statements or engage in any of the conduct alleged by Plaintiffs in their ACRD charges." (Doc. 184-1, Exh. 2, ¶3).

At his deposition, Dettloff denied that: in October 2010, he told Sierra that he thought she was Cornejo, "'but by looking at your [Sierra's] behind I can tell that it's not your mom [Cornejo], it's you'"; in April 2011, he asked Cornejo how much she charged for hanging out in the streets, when she entered the office after speaking to her boyfriend in the parking lot; in April 2011 when Cornejo was leaving work because of a headache, he told her that the doctor would check her breasts to make them feel better and he made squeezing motions with his hands; in April 2011, he tiptoed to the front of Cornejo's desk and looked down her blouse saying he wished he were taller so he would get a better view; and that he stated in May 2011 something to the effect that he expected all managers to go to Monte Carlo for a meeting, they would meet at a nude beach and drink lots of alcohol. (Doc. 184-1, Exh. 1, pp. 15, 23-24). Although Dettloff admitted that in April 2011, when he saw Cornejo's tattoo on her lower back, he commented that he did

---

[5] Dettloff also stated in his ACRD declaration that without information from Cornejo as to dates of the comments she alleges he made, "the only response I can make is to deny the allegations as a whole and say that I believe I treated Maria Cornejo with nothing but respect during the entire time she worked for MauiSun. I am disheartened that she would accuse me of any appropriate behavior." (Doc. 184-1, Exh. 2, internal exh. 5, ¶14; see also Doc. 184-1, Exh. 1, p. 16 (Dettloff's deposition testimony that "at some point in time I probably..." commented about the clothes worn by female employees)).

1   not know that she had a tattoo, he denied saying anything about wondering how far it
2   went down her back. (Doc. 184-1, Exh. 1, pp. 15, 22-24).

3   ## 2.   RETALIATION CLAIM

4   The parties do not dispute that on July 6, 2011, Dettloff suspended Cornejo for
5   three days without pay for insubordination. (Doc. 153, ¶¶24-23; Doc. 168, ¶K; Doc.
6   184, ¶K). Although Cornejo disputes that she was insubordinate, it is undisputed that on
7   July 6, 2011, Dettloff confronted Cornejo at the office about the fact that "you guys
8   called [Workman-Parker] without my permission" to inquire whether they would have
9   the July 4th holiday off, even though they could have asked Dettloff who was at the office
10  when the call was made. (Doc. 153, ¶¶17-18, 21; Doc. 153-1, Exh. D, p. 73; *see also*
11  Doc. 153, ¶15; Doc. 168, ¶¶15, 21; *see also* Doc. 153-1, Exh. B, p. 44 (Operations
12  Manager Jess Gauntt made the call)). Dettloff went on to tell Cornejo that no one was to
13  call Workman-Parker when she was not in the building. (Doc. 153, ¶21; Doc. 168, ¶21).
14  While Dettloff was speaking to Cornejo, she turned away from him to face the other
15  direction until he said: "You did [sic] not give your back at me. You turn around. I'm
16  not done talking. Don't forget who the owner of this company is[]", at which time she
17  turned around to face him and said, "Okay." (Doc. 153, ¶22; Doc. 153-1, Exh. A, p. 46;
18  Doc. 168, ¶22). According to Cornejo, Dettloff accused her of being rude and
19  disrespectful to him, which she denied, and she was soon suspended. (Doc. 153-1, Exh.
20  B, p. 46; Doc. 153-1, Exh. D, p.2; *see also* Doc. 153-1, Exh. C, p. 3 (Dettloff informed
21  Cornejo that if she did not "come back with a new attitude, it's going to be three more[]"
22  days of suspension)). Cornejo asserts that she did not turn away from Dettloff out of
23  disrespect, but because he had gotten close to her, was shouting in her face "in a
24  threatening manner and [she] became fearful."[6] (Doc. 168, ¶K).

---

25  [6] Cornejo secretly recorded the confrontation. (Doc. 168, ¶L). MauiSun contends
26  that the transcript shows that Dettloff "made no threatening statements to Cornejo…" and
    the tone of his voice is not threatening. (Doc. 184, ¶M). The recording itself has not
27  been submitted as evidence and, thus, the Court is in no position to assess Dettloff's tone.
28  Nor has MauiSun cited any support that such a determination may be made on summary
    judgment. As for whether Dettloff made threats, Dettloff instructed Cornejo to "not ever

Before leaving the office on the day she was suspended, Cornejo informed Dettloff that she and Sierra "filed a complaint for sexual harassment against you, so it's your decision what you want to do from now on, David."[7] (Doc. 153-1, Exh. C, pp. 3-4; *see also* Doc. 215, ¶13 ("Dettloff was very angry and threatening during our encounter on…July 6 2011, when he suspended me and I told him about my daughter (Yareli Sierra) and I having reported his sexual harassment to the ACRD.")).

MauiSun asserts that during Cornejo's suspension, Dettloff learned her files were in disarray and called in the bookkeeper who later presented Dettloff with an original and an altered petty cash log, from which Dettloff concluded that Cornejo, who was the only person who maintained the petty cash logs, "stole money from MauiSun and attempted to conceal her crime by creating the forged petty cash log." (Doc. 184-1, Exh. 2, internal exh. 5, ¶¶6-8, 10; *see also id.* at ¶8 (logs reflected that $100 was missing)). During her deposition, Cornejo conceded that $100 was missing, but stated that she spoke to Dettloff about it at some point and he instructed her "to go ahead and change it, that he had probably given it for a beer run." (Doc. 184-1, Exh. 6, p. 56 (Cornejo did not remember the date of that conversation)). Based on Dettloff's instructions, Cornejo "went back and …did a new petty cash log." (*Id.* at p. 57; *Id.* at p. 58 (Cornejo also stated during the ACRD investigation that she changed the log because it contained mistakes)).

---

forget who owns and runs the company. You will talk to me with respect at all times or you will leave." (Doc. 1531-1, Exh. C, p. 2). When Cornejo said she was speaking with respect, Dettloff asked: "You want to try this with me?" (*Id.*). When Cornejo asked why Dettloff was sending her home, he responded: "…don't go there…I don't explain myself to you or anybody else." (*Id.*). Dettloff's comments speak for themselves and Cornejo is entitled to present testimony as to how those comments made her feel.

[7] During the ACRD investigation, Dettloff denied that Cornejo made this statement to him. (Doc. 184-1, Exh. 2, ¶4; Doc. 184-1, Exh. 2, internal exh. 5, ¶13). However, Dettloff later acknowledged that the recording Cornejo made of their July 6, 2011 encounter reflects that she made such a statement. (Doc. 184-1, Exh. 2, ¶4). According to Dettloff, he "did not at the time [he] completed the [ACRD] declaration recall this statement and still have no recollection that she made such a statement but I do not challenge the accuracy of the transcript of the conversation." (*Id.*).
Additionally, although Cornejo contacted the ACRD in June 2011 concerning Dettloff's conduct, she did not file an actual charge of discrimination until after her July 16, 2011 termination. (*See* Doc. 168, ¶J).

When Cornejo returned to MauiSun after her 3-day suspension, she was informed that she had been demoted and would receive a pay cut

> [d]ue to poor attitude and direct disrespect to owner, (insolence) as well as discovering after outside review of HR files grossly inadequate procedures were uncovered, i.e., changing of petty cash record, dis-organization of HR department files, mismanagement of payroll resulting in mistakes leading to extra fees charged to the company.....

(Doc. 184-1, Ex. 2, internal exh. 6).  Also, on July 9, 2011, Cornejo was suspended for three additional days for insubordination for refusing to sign personnel action records. (*Id.*).  According to Dettloff, "[d]uring the second suspension, Cornejo's managers made the decision to terminate [her] for her conduct including her theft from MauiSun. [He] was not involved in the decision." (Doc. 184-1, Exh. 2, internal exh. 6, ¶12).  On July 16, 2011, Cornejo was terminated. (Doc. 184-1, Exh. 2, internal exh. 5; Doc. 153-1, Exh. E).  Cornejo contends that when Operations Manager Jess Gauntt terminated her, he said her "'services were no longer needed' because 'the company was going in a different direction'." (Doc. 168, ¶N).  Cornejo asserts that the July 16, 2011 Separation Notice that Gauntt signed and gave to her indicated simply that she was: "Discharged".  (*Id.*; *see also* Doc. 153-1, Exh. E (July 16, 2011 Separation Notice)).  Cornejo further states that she did not learn of MauiSun's accusation that she stole petty cash until during the ACRD investigation which occurred after her termination. (Doc. 168, ¶O).  She avows that the accusation is false. (*Id.*).

MauiSun has submitted a July 16, 2011 Employee Separation Form, completed by Guantt, indicating Cornejo was discharged for:  fighting on company property with "Francisco, Yareli", insubordination, cash shortages "see papers re: petty cash", improper conduct, falsification, "[i]nsolence, gross negligence regarding payroll [and] employees [sic] child support. (Doc. 184-1 Exh. 2, internal exh. 6).

## C.   RELEVANCE OF REASONABLE CAUSE DETERMINATION

After an investigation into the charges filed by Plaintiffs, the ACRD issued a Reasonable Cause Determination as to each Plaintiff, finding that there was reasonable

cause to believe that unlawful discrimination occurred.[8] (*See* SAC, Exhs. 2, 4).

A reasonable cause determination "does not suggest to the jury that the EEOC has already determined there has been a violation. Rather, it suggests that preliminarily there is reason to believe that a violation has taken place." *Gilchrist v. Jim Slemons Imports,* 803 F.2d 1488, 1500 (9th Cir. 1986). In the Ninth Circuit, "the plaintiff has a right to introduce an EEOC probable cause determination in a Title VII lawsuit, regardless of what other claims are asserted, or whether the case is tried before a judge or jury." *Plummer v. Western Intern. Hotels Co., Inc.,* 656 F.2d 502, 505 (9th Cir. 1981) (holding that the probative nature of the reasonable cause determination outweighs the prejudicial effect it might have on the jury). *See Arizona ex rel Goddard v. Frito-Lay,* 273 F.R.D. 545, 551-52 (D. Ariz. 2011) (applying *Plummer* and its progeny to ACRD reasonable cause determination). However, the *Plummer* court was clear that the defendant "is free to present evidence refuting the findings of the EEOC and may point out deficiencies in

---

[8] With regard to Cornejo, the ACRD found in pertinent part:

Dettloff's conduct and offensive comments of a sexual nature were sufficiently severe or pervasive to change the terms and conditions of Cornejo's employment, and those of her similarly-situated female co-workers. As such, MauiSun subjected Cornejo and her similarly-situated female co-workers to a sexually hostile work environment in violation of A.R.S. § 41-1463(B)(1);
* * *
Even after Cornejo complained about Dettloff's offensive conduct and comments, on behalf of herself and other similarly-situated female employees, MauiSun failed to take any effective steps to remedy the sexually hostile work environment;
* * *
After Cornejo complained of the harassment, referred one of Respondent's employees to the Division to file a charge of discrimination, and informed Dettloff that she and Sierra had filed charges of discrimination with the Division, MauiSun retaliated against her by suspending her, demoting her, and ultimately terminating her employment. [MauiSun's] allegedly legitimate reasons for terminating her employment are belied by credible evidence. As such, MauiSun unlawfully retaliated against Cornejo for opposing an unlawful employment practice in violation of A.R.S. § 41-1464(A).

(Doc. 215-1, Exh. 2, p. 5). The Arizona statutes cited by the ACRD are "'generally identical' to . . ." the federal statutes that Plaintiffs allege were violated here. *Bodett v. CoxCom, Inc.,* 366 F.3d 736, 743 (9th Cir. 2004) (quoting *Higdon v. Evergreen Int'l Airlines, Inc.,* 138 Ariz. 163, 673 P.2d 907, 909–10, n. 3 (1983)).

1   the EEOC determination….Such evidence would go to the weight to be given by the trier

2   of fact to the EEOC determination." *Plummer*, 656 F.2d at 505 n. 9 (citation omitted).

3         Although the Ninth Circuit has held that the EEOC's finding of reasonable cause,

4   after an impartial investigation, "was sufficient at least to create an issue of fact…"

5   *Gifford v. Atchison, Topeka and Santa Fe Ry. Co.*, 685 F.2d 1149, 1156 (9th Cir. 1982),

6   the Ninth Circuit has also granted summary judgment in favor of the employer where the

7   EEOC's reasonable cause determination was "conclusory and completely devoid of

8   analysis."   *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282-84 (9th Cir. 2000).

9   Recognizing that EEOC reasonable cause determination letters "are not homogeneous

10  products; they vary greatly in quality and factual detail….", the *Coleman* court found the

11  reasonable cause determinations before it was insufficient to create a genuine issue of

12  material fact because "[i]t is impossible from this letter to know what facts the EEOC

13  considered and how it analyzed them." *Id.* at p. 1284 (internal quotation marks and

14  citation omitted).  *See also Mondero v. Salt*, 400 F.3d 1207, 1215 (9th Cir. 2005 (two-

15  page EEOC determination, which merely recited the allegations, without offering any

16  analysis, was insufficient to defeat summary judgment).

17        The reasonable case determination in Cornejo's case is quite thorough, setting out

18  her allegations and summarizing MauiSun's position and Cornejo's, Sierra's, and

19  Lopez's testimony. (*See* Doc. 215-1, Exh 2). The determination reflected that some of

20  Cornejo's testimony about offensive conduct was corroborated by Lopez and went on to

21  identify that testimony.  The ACRD also noted that while Dettloff denied making the

22  offensive comments alleged by Cornejo, Workman-Parker and MauiSun Operations

23  Manager Gauntt believed Dettloff made inappropriate comments in the workplace.  In

24  this case, the ACRD reasonable cause determination is far from conclusory; instead, it

25  discusses in detail the evidence submitted and relied upon by the ACRD in its analysis

26  and ultimate conclusion.

27

28

**D.   THE CROSS-MOTIONS WITH REGARD TO CORNEJO'S SEXUAL HARASSMENT CLAIM**

Federal law prohibits employment discrimination against individuals on the basis of sex. 42 U.S.C. §2000e-2(a)(1) ("Title VII"). "Sexual harassment is a species of gender discrimination..." and generally falls into two categories: hostile work environment, as Cornejo alleges here, and quid pro quo. *Brooks v. City of San Mateo,* 229 F.3d 917, 923 (9th Cir. 2000) (citation omitted). "A 'hostile work environment' occurs when there is a pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." *Draper v. Couer Rochester, Inc.,* 147 F.3d 1104, 1108 (1988) (citing *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 66-67 (1986)); *see also Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21 (1993) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (quoting *Vinson,* 477 U.S. at 65, 67). To establish a *prima facie* case of a hostile work environment, the plaintiff must establish that: (1) she was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment. *Porter v. California Dep't. of Corrections,* 419 F.3d 885, 893 (9th Cir. 2004). Moreover, the plaintiff must establish that her workplace was both objectively and subjectively offensive. *Nichols v. Azteca Rest. Ents., Inc.,* 256 F.3d 864, 871 (9th Cir. 2001). "The 'objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Id.* at 872 (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 79 (1998)).

The Ninth Circuit has observed that "it should not take much for plaintiff in a discrimination case to overcome a summary judgment motion....This is because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *Nigro v. Sears*

*Roebuck,* 784 F.3d 495, 499 (9th Cir. 2015) (internal quotation marks and citations omitted)); *see also McGinest v. GTE Serv. Corp.,* 360 F.3d 1103, 1112 (9th Cir. 2004) ("In evaluating motions for summary judgment in the context of employment discrimination, we have emphasized the importance of zealously guarding an employee's right to a full trial, since discrimination claims are frequently difficult to prove without a full airing of the evidence and an opportunity to evaluate the credibility of the witnesses.")

### 1.   CORNEJO'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Cornejo argues that MauiSun has not denied her allegations about Dettloff's conduct that she contends created a hostile work environment, thus requiring entry of partial summary judgment in her favor.

In opposing Cornejo's MPSJ, MauiSun submits Dettloff's August 7, 2015 Declaration statement that: "The statements I made in the declaration [submitted in 2011 during the ACRD investigation] were true to the best of my knowledge at the time I made them. I did not make any of the statements or engage in any of the conduct alleged by Plaintiffs in their ACRD charges."<sup>9</sup> (Doc. 184-1, Exh. 2, ¶3). Dettloff stated in his ACRD declaration, in pertinent part:

> I do not believe that I can make an adequate response to Cornejo's charges of discrimination because she put no facts into her charges. If Cornejo had provided any dates or times for the comments she seems to allege that I made, I would have looked back at my calendar and talked to others in the office including Ms. Workman-Parker to try to recall what happened on the dates alleged. Without that information, I believe the only response I can make is to deny the allegations as a whole and to say that I believe I treated Maria Cornejo with nothing but respect during the entire time she worked for MauiSun. I am disheartened that she would accuse me of any inappropriate behavior. I did not make comments to Cornejo about her

---

<sup>9</sup> In pertinent part, Cornejo alleged in her ACRD Charge that

During my employment with [MauiSun] and as recent as June 21, 2011, Dettloff subjected me to comments of a sexual nature. Specifically he would comment about my breasts, and my choice of clothing. I objected to his comments, but Dettloff did not cease.

(Doc. 215-1, Exh 1, p.1).

breasts, although I did occasionally comment on her dress because she seemed to me to be so fashionable. The comments I made about her dress did not contain any sexual references and certainly were not intended to convey any sexual messages.

(Doc. 184-1, Exh. 2, internal exh. 5, ¶14). MauiSun also submits Dettloff's deposition testimony denying a comment Lopez testified she heard him make to Cornejo that Cornejo's "'breasts looked like two oranges that he could pick.'" (Doc. 184-1, Exh.1, p. 14; *see also* Doc. 215-1, Exh. 2, p. 3)). During his deposition, Dettloff also denied several of the specific instances of conduct that Cornejo alleges in this action.

A fair reading of Dettloff's declaration submitted to the ACRD together with his deposition testimony supports the conclusion that he categorically denies making comments about Cornejo's breasts and that he denies the specific conduct alleged in incidents 1, 2, 4 through 9, and 12. However, Dettloff's ACRD Declaration and deposition testimony do not specifically address Cornejo's allegations concerning incidents 3, 10, 11, and 13 which occurred on March 1, 2011, May 9, 2011, June 2, 2011, and June 21, 2011, respectively. Dettloff also admitted that he "probably" commented about the clothing worn by female employees to the effect that the attire looked "nice. . . [or] bad, . . .[or] appropriate for work." (Doc. 184-1, Exh. 1, pp. 15-16). Because Dettloff's testimony included that his comments addressed whether the clothing was appropriate for work, Cornejo's assertion to the contrary is arguably disputed, at least in part.

Cornejo argues that Dettloff's denials do not create an issue of fact because his statements are conclusory, self-serving, and unsupported by any factual information. (Doc. 218, pp. 3-4). Cornejo's argument is unavailing. *See Securities Exchange Commission v. Phan,* 500 F.3d 895, 909 (9th Cir. 2007) ("As we have previously noted, declarations oftentimes will be 'self-serving'—'[a]nd properly so, because otherwise there would be no point in [a party] submitting [them].'") (quoting *United States v. Shumway,* 199 F.3d 1093, 1104 (9th Cir. 1999). Instead, "[i]n most cases . . .'[t]hat an affidavit is self-serving bears on its credibility, not on its cognizability for purposes of

establishing a genuine issue of material fact.'" *Id.* (quoting *Shumway,* 199 F.3d at 1104); *see also Dominguez-Curry v. Nevada Transp. Dep't.,* 424 F.3d 1027, 1035-36 (9th Cir. 2005) (same).   Only in certain instances, such as when an "'affidavit state[s] only conclusions, and not such facts as would be admissible in evidence, [] can a court disregard a self-serving declaration for purposes of summary judgment." *Id.* (quoting *Shumway,* 199 F.3d at 1104 (internal quotation marks and citation omitted))   Here, Dettloff's declaration and deposition testimony involves his own actions, which are central to Cornejo's claim.   *See Phan,* 500 F.3d at 909-10 (statements in defendants' declarations that were based on personal knowledge must be taken as true and "[t]he district court was thus wrong to disregard the declarations as 'uncorroborated and self-serving.'").

Further, Dettloff's denials are "direct evidence of the central fact in dispute. [Dettloff] does not ask that inferences be drawn in his favor, but that his testimony be taken as true." *McLauglin v. Liu,* 849 F.2d 1205, 1208 (9th Cir. 1988). As the respondent to Cornejo's MPSJ, MauiSun's evidence is to be believed. *Leslie v. Groupo,* ICA, 198 F.3d 1152, 1157 (9th Cir. 1999).   In this regard, the Ninth Circuit has "specifically rejected the notion that a court could disregard direct evidence on the ground that no reasonable jury would believe it." *Id.* at 1159 (citing *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n.,* 809 F.2d 626, 631 n.3 (9th Cir. 1987)); *McLaughlin,* 849 F.2d at 1208 ("We have upheld summary judgment on the basis of *Matsushita's* 'implausibility' standard only where the non-movant relied on inferences from circumstantial evidence.") (footnote omitted).   "If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party.   The nonmoving party's evidence must be taken as true." *T.W. Elec. Serv., Inc.,* 809 F.2d at 631.

However, Dettloff's specific denials do not encompass the March 1st, May 9th, and June 2nd and 21st incidents alleged by Cornejo.   Dettloff was apparently not aware of these specific allegations when he completed his ACRD declaration.   However, during

the course of the ACRD investigation they came to light and have been alleged in this litigation.   Dettloff has not specifically addressed them.   Dettloff's general denial submitted to the ACRD was made without reference to the specific conduct he was denying and, consequently, does not amount to a denial of the conduct specifically alleged in this litigation. Dettloff had the opportunity to address these specific instances through discovery and/or by submitting an affidavit, but he did not.

Nor can Dettloff's general assertion in his ACRD declaration that he treated Cornejo "with nothing but respect during . . ." her employment, without more, be reasonably viewed as a denial of the conduct alleged. *See e.g. Villiarimo,* 281 F.3d at 1065 n. 10 ("At summary judgment, th[e] court need not draw *all* possible inferences in [the non-movant's] favor, but only *all reasonable* ones.") (emphasis in original). It may well be that Dettloff's concept of treating Cornejo with respect consisted of the alleged conduct that Cornejo found offensive.   The issue is not whether Dettloff subjectively thought *he* was being respectful, but rather whether his conduct was subjectively offensive to Cornejo and objectively offensive to a reasonable person.   A reasonable jury could find the conduct offensive despite Dettloff's opinion that he was acting with "nothing but respect."  Consequently, the instant record reflects that the four unaddressed incidents are undisputed.   The next question is whether Cornejo is entitled to judgment as a matter of law upon consideration of those four incidents.

"To determine if an environment is sufficiently hostile or abusive to violate Title VII, [the court]...look[s] at 'all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Nichols,* 256 F.3d at 872 (quoting *Harris,* 510 U.S. at 23). "The required level of severity or seriousness 'varies inversely with the pervasiveness or frequency of the conduct.'" *Id.* (quoting *Ellison v. Brady,* 924 F.2d 872, 878 (9th Cir. 1991)). Although the Ninth Circuit has held that "a single 'incident' of harassment [] can support a claim of hostile work environment, . . .'" if it is sufficiently severe, *Little v.*

*Windemere Relocation, Inc.,* 301 F.3d 958, 967-68 (9th Cir. 2001) (rape), a hostile environment usually occurs over a series of days or perhaps years and is based on the cumulative effect of the individual acts. *National R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 115 (2002); *see also Arizona v. Geo Group, Inc.,* 816 F.3d 1189, 1207 (9th Cir. 2016) (while each incident alone "may not in itself be sufficient to support a hostile work environment claim, their cumulative effect is sufficient to raise material issues of fact as to whether the conduct was so severe or pervasive to alter the conditions of the workplace."), *petition for cert. filed* (U.S. Sep. 9, 2016) (No. 16-302). Cornejo bears the burden of establishing that the conduct at issue was "'sufficiently severe or pervasive to alter the conditions of . . . [her] employment and create an abusive working environment . . .'" *Morgan,* 536 U.S. at 115 (quoting *Harris,* 510 U.S. at 21).

Here, the record reflects four undisputed instances of comments in 2011 of a sexual nature that Cornejo found offensive: one in March, one in May, and two in June. "Title VII is not a 'general civility code.' A violation is not established merely by evidence showing 'sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *EEOC v. Prospect Airport Servs., Inc.,* 621 F.3d 991, 998 (9th Cir. 2010) (quoting *Faragher v. City of Boca Raton,* 524 U.S. 775, 788 (1998)). Thus, "'[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Nichols,* 256 F.3d at 872 (quoting *Faragher,* 524 U.S. at 788 (1998).While Dettloff's conduct was certainly inappropriate, it was not physical and, although Cornejo stated that the entirety of Dettloff's alleged conduct interfered with her ability to perform her job, she has not stated that these four instances, in and of themselves, so affected her. *Compare, Westendorf v. West Coast Contractors of Nevada, Inc.,* 712 F.3d 417, 422 (9th Cir. 2013) (where the plaintiff did not say that her work suffered because of five occasions of offensive sexual comments over a four-month period, "the evidence, viewed favorably to her, did not show sexual harassment that was sufficiently severe or pervasive to alter the terms of [her] employment and subject her to an abusive environment. . . .")

- 18 -

*with Draper,* 147 F.3d 1104 (reversing summary judgment in favor of employer where plaintiff presented evidence that she felt uncomfortable, humiliated, and angry much of the time over a two-year period because her supervisor, among other comments, made sexual remarks about her in and out of her presence; called her "beautiful" and "gorgeous" instead of using her name; told her about his sexual fantasies including his desire to have sex with both her and his wife; commented about her "ass" several times; told other co-workers that "'it would be fun to get into [plaintiff's] pants'"; used a loud speaker to inform plaintiff that "several guys" were willing to assist her if she needed help changing out of some wet clothes; walked up behind plaintiff "as she was shoveling dirt and told her 'to be careful who you bend over in front of'"; when the plaintiff took off a sweat shirt she was wearing over another shirt he "asked over a loudspeaker whether that was all she was going to take off"; and laughed when she complained to him about his conduct).

The evidence also reflects that, at some point, Cornejo as Human Resources Manager received complaints from other female employees, including Lopez[10] about Dettloff's conduct based on their sex that they found offensive. (Doc. 215-1, Exh. 2, p. 4; *see also id.* (Lopez and Sierra testified before the ACRD that they reported Dettloff's inappropriate conduct to Cornejo)). At her deposition, Cornejo also indicated that she was aware[11] that on March 3, 2011 Sierra "was vaping in the lounge and David [Dettloff]

---

[10] Cornejo testified before the ACRD that Lopez complained to her about: Dettloff's comment that when Lopez was dusting furniture at the office, he pictured her in a French maid's uniform; she felt he was staring at her; and he sometimes put his hand on her shoulder while she was at her computer. (Doc. 215-1, Exh. 2, p. 3; *see also id.* at p. 2).

[11] Cornejo's testimony is not clear whether she actually witnessed the conduct:
    Q. [MauiSun's counsel]:   The statements that you've complained
       of were that, that you're here as a witness about for other people,
       were between October 2010 and June 2011; correct?
    A. [Cornejo]:            Yes.
(MauiSun's 2016 Controverting Statement of Facts (Doc. 217-1), Exh. 10, p. 79).
    Cornejo went on to explain: "These are the comments that I took notes of and that I could remember[]" and that she had an independent recollection of the comments. (*Id.* at p. 80). It is not entirely clear whether she witnessed the conduct toward the others or whether she learned about it later. If Cornejo did not witness Dettloff's conduct toward the other women, it is unclear when she learned about it.

told her 'I bet you can blow real good'[.]   Michael the lounge manager was there and responded 'She knows how to vape pretty good'.   He tried to change the subject but David said that's not what he meant." (Doc. 217-1, Exh. 10, p. 3; *see also* Doc. 217-1, Exh. 11, pp. 79-80).   Also on March 3, 2011, when Sierra was in the breakroom eating and "putting on makeup . . . David [Dettloff] walked in and looked at her in a perverted way.   He told her she was lucky she was not 18 years old." (Doc. 217-1, Exh. 10, p. 3).   On an unspecified date, Dettloff told Sierra "he can take care of the problem of her not having kids." (*Id.*).

Cornejo also testified during her deposition that she knew that Dettloff made "a lot of comments, to [someone named] Gabby.   He pretty much made a lot of comments to her." (Doc. 217-1, Exh. 11, p. 83).   Cornejo provides no specifics about the comments to Gabby.   Although Cornejo testified that Dettloff's sexual comments were constant, she also testified that: "there was [sic] times he would say them more than once a week, and there was [sic] times where he wouldn't say them for a week or two weeks." (*Id.*).

"[I]f...hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff.'" *Dominguez-Curry,* 424 F.3d at 1036 (quoting *McGinest,* 360 F.3d at 1117) (footnote omitted); *cf. Brooks,* 229 F.3d at 924 (9th Cir. 2000) ("Harassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether she reasonably considered her working environment abusive.").   Cornejo provided no specific instances involving harassment directed at Gabby other than to say that Dettloff made comments to her of a sexual nature, nor does she suggest when she became aware of those comments.   While Cornejo was aware of some of Dettloff's comments to Lopez and Sierra, the information submitted does little to establish when she actually became aware of that behavior.[12]   At best, questions of fact remain to be determined about the timing of these

---

[12] The ACRD reasonable cause determination reflects that:

Cornejo testified that she received reports of inappropriate sexual comments from several female employees.   She reported Dettloff's inappropriate conduct and the reports from co-workers to Operations

1   other complaints. Consequently, Cornejo's testimony about Dettloff's alleged

2   inappropriate conduct toward other female employees does little to bolster her claim that

3   the four undisputed incidents occurring in March, May and June 2011, while certainly

4   offensive, created or contributed to creating a work environment that was "permeated

5   with 'discriminatory intimidation, ridicule, and insult.'" *Harris,* 510 U.S. at 21 (quoting

6   *Vinson,* 477 U.S. at 65).

7      Nor does Cornejo's reliance on the ACRD determination alter the outcome. As

8   discussed *supra,* that determination is not evidence of a Title VII violation, but instead

9   "suggests that preliminarily there is reason to believe that a violation has taken place."

10  *Gilchrist,* 803 F.2d at 1500. Moreover, the ACRD determination was based on the

11  entirety of Cornejo's allegations and not just the four undisputed incidents.

12     Upon consideration of the evidence presented, Cornejo has failed to carry her

13  burden to establish that she is entitled to partial summary judgment on her sexual

14  harassment claim.

15                    2.   MAUISUN'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

16     MauiSun argues that it is entitled to summary judgment on Cornejo's sexual

17  harassment claim because "[t]here is no genuine dispute that the comments Cornejo

18  alleges were not sufficiently severe or pervasive enough to constitute an actionable claim

19  for sexual harassment." (Doc. 216, p. 1). According to MauiSun, even if Cornejo's

20  allegations about Dettloff's conduct are taken as true, the incidents she describes "are

21  sophomoric at best." (MauiSun's Reply (Doc. 222), p. 2). Nor can Cornejo establish that

---

Manager Douglas Koch ("Koch"), who said he would talk to Dettloff, but the comments did not stop. Cornejo also complained to Koch's replacement, Gauntt; and

[] Cornejo testified that when Lopez complained about Dettloff's conduct and remarks, specifically that he pictured Lopez in a French maid's uniform, Lopez felt he was staring at her, and he sometimes put his hand on Lopez's shoulder while she was at her computer, Cornejo felt that [MauiSun] would not correct the problem, so she gave Lopez the telephone number for the [ACRD].

(Doc. 215-1, Exh. 2, p. 4; *see also id.* ("Cornejo testified that she spoke with Gauntt regarding Dettloff's offensive comments on or about June 1, 2011.")).

Lopez filed her charge with the ACRD on June 2, 2011. (*Id.*).

they "happened daily or changed her work environment."   (*Id.*).

As discussed above, the court considers the totality of the circumstances when determining whether a work "environment is sufficiently hostile or abusive to violate Title VII . . . ." *Nichols,* 256 F.3d at 872 ("The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.") (internal quotations and citations omitted).   MauiSun attempts to categorize the "types" of conduct that Cornejo found offensive as follows:  (1) Dettloff's comment about wanting to accompany her to a hypothetical doctor's appointment for a "woman's checkup" so he could be there for the examination; (2) two of Dettloff's comments about Cornejo's breasts; (3) Dettloff's comment about always wondering how far down Cornejo's back her tattoo went; and (4) when she was adjusting the belt of her dress, Dettloff made a comment about watching her take her clothes off.  (Doc. 216 at p. 7).  In categorizing Dettloff's conduct, MauiSun omits other comments Dettloff made that Cornejo found offensive or that, on one occasion, he tip-toed to the front of Cornejo's desk  to look down her blouse and lamented that he was not taller so he could have a better view, and that she had witnessed him make the same comment to another female coworker.  As the opponent to MauiSun's XMPSJ, Cornejo's description of Dettloff's conduct at issue must be accepted as true. *See Leslie,* 198 F.3d at 1157; *McLaughlin,* 849 F.2d at 1208.

Moreover, as discussed above, while Cornejo was contending with Dettloff's conduct directed at her, as Human Resources Manager she also received reports of Dettloff's inappropriate sexual conduct from other female employees, including Lopez and Sierra. (*see* 215-1, Exh. 2, p. 4; *see also id.* (Lopez and Sierra testified before the ACRD that they reported Dettloff's inappropriate conduct to Cornejo)).  Although this consideration did not warrant partial summary judgment in Cornejo's favor because questions of fact remain as to the timing of this knowledge, the record supports the conclusion that Cornejo knew about Lopez's complaints in early June at the latest.  A reasonable jury could infer that Sierra kept Cornejo, who was her mother, apprised of Dettloff's inappropriate comments directed at Sierra.  Drawing all reasonable inferences

in Cornejo's favor as the opponent to MauiSun's XMPSJ, the evidence supports the conclusion that Cornejo was aware of harassment directed at other employees during part of the time that she, too, was on the receiving end of Dettloff's offensive conduct. Where "'hostility pervades a workplace, a plaintiff may establish a violation of Title VII, even if such hostility was not directly targeted at the plaintiff.'" *Dominguez-Curry,* 424 F.3d at 1036 (quoting *McGinest,* 360 F.33d at 1117) (footnote omitted).

MauiSun also attempts to minimize the frequency and impact of Dettloff's conduct by citing to Cornejo's testimony that Dettloff made comments she found offensive "more than once a week [at times], and there was [sic] times where he wouldn't say them for a week or two weeks." (Doc. 217-1, Exh. 11, p. 83; *see also* Doc. 216, p.8).[13] MauiSun also points out that Cornejo relies on "just 11[14] comments to her that she considered to constitute sexual harassment in her 10 months of employment: two comments in March, 2011; four comments in April 2011; two comments in May 2011; and three in June 2011."[15] (Doc. 216, pp. 8-9 (citing Doc. 217, ¶110)). According to MauiSun, the number of alleged incidents undermine Cornejo's contention that "[t]he acts occurred with such frequency . . . that they interfered with my ability to concentrate on my job duties.'" (*Id.* at p. 9 (labeling Cornejo's statements a legal conclusion and a "sham")). Nor does Cornejo claim she was threatened or humiliated by Dettloff's conduct. (*Id.*).

To prevail, Cornejo "must show that she perceived her work environment to be

---

[13] It appears the comments were directed at other employees in addition to Cornejo. (*See* Doc. 217-1, Exh. 10 at p. 83). According to MauiSun, this means "that comments made to [Cornejo] necessarily were less frequent that [sic] than *on average.*" (Doc. 216, p. 8 (emphasis in original)). By suggesting that Dettloff's comments directed at other female employees may have subjected Cornejo to less harassment on average, MauiSun overlooks that if hostility pervades the workplace, Cornejo may establish a violation of Title VII, "even if such hostility was not directly targeted at her . . .", as long as she was aware of that conduct during the relevant time. *See e.g., Dominguez-Curry,* 424 F.3d at 1036.

[14] The record reflects 13 instances of conduct. *See, supra,* at pp. 4-6.

[15] Cornejo was suspended on July 6, 2011 for three days, again suspended on July 9th, and ultimately terminated on July 16th.

hostile, and that a reasonable person in her position would perceive it to be so." *Dominguez-Curry*, 424 F.3d at 1035. Here, it cannot be said that Dettloff's comments were of an isolated or offhand nature. He consistently focused his comments, innuendo, and actions toward Cornejo's breasts and wanting to see her body whether she be nude or in a bikini or without her panties or at her doctor's appointment—conduct that Cornejo said she found personally offensive. At some point during her employment, Cornejo also became aware that Dettloff directed offensive comments and conduct toward other female employees, including her daughter. A reasonable jury could believe Cornejo's testimony that she found the conduct offensive. A reasonable jury could also find Dettloff's conduct objectively offensive, as well. That the comments and conduct directed at Cornejo were clustered over a fourth-month period during her 10 months at MauiSun does not defeat her claim on this record. Instead, the evidence is that Dettloff persisted with his comments over a four-month period beginning in March and he did not stop despite Cornejo's complaints to him and to other MauiSun management.[16] (Doc. 215-1, Exh. 2, p. 4; Doc. 215, ¶9). Additionally, prior to her termination Cornejo ultimately contacted the ACRD about Dettloff's conduct toward her. (Doc. 215, ¶¶ 9-10). Cornejo's complaints to Dettloff and to other MauiSun management, and her contact with the ACRD also serve to create a triable issue as to whether she found Dettloff's conduct subjectively offensive. *See e.g., Dominguez-Curry*, 424 F.3d at 1037 n.4 (citing *McGinest*, 360 F.3d at 1113).

Further, as to whether Dettloff's conduct affected Cornejo's work, "'if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment." *Prospect Airport Servs., Inc.*, 621 F.3d at 998 (quoting *Harris*, 510 U.S. at 21-22)). Cornejo states that Dettloff's

---

[16] The record suggests that even MauiSun's receipt of Lopez's ACRD charge on June 8, 2011 did not temper Dettloff's conduct given that on June 21, 2011, which was a windy day, he told Cornejo who was wearing a loose-fitting dress to "walk back outside and not to hold her dress so he could see what color panties she was wearing. Dettloff then told her if he was lucky she wouldn't be wearing any panties." (Doc. 215-1, Exh. 2, pp. 3; *see also id.* at p. 4 (indicating receipt date)). Dettloff has not specifically denied that he made such a comment.

conduct "caused such stress that [it] interfered with my ability to concentrate on my job duties . . . Dettloff's conduct . . . had become very stressful and almost intolerable to me, but I needed to keep my job, so I contacted the ACRD by telephone...." (Doc. 215, ¶¶ 9-10). How and if Dettloff's conduct interfered with Cornejo's ability to do her job is a matter within her personal knowledge and it is up to the jury to assess her credibility on this issue. As discussed above, a reasonable jury could conclude that Cornejo's work environment was subjectively and objectively offensive due to Dettloff's behavior. Moreover, a reasonable jury could conclude that Dettloff's discovery during Cornejo's suspension that, among other things, her work files were in disarray, also supports her claim that Dettloff's conduct made it difficult for her to concentrate on her work.

MauiSun also argues that "no fact factfinder could believe the conduct was subjectively severe because "Cornejo admits that she went out to lunch with Dettloff on nearly a weekly basis throughout the entire time." (Doc. 216, p. 8 (citing unidentified document at p. 88)). MauiSun's citation to the record is incomplete and is not clear what evidence supports this assertion. Nor are the circumstances surrounding the luncheons elucidated. At oral argument, Cornejo's counsel stated the lunches were in a group setting. While the jury could certainly consider this fact in assessing Cornejo's credibility, the fact, alone, that Cornejo had weekly lunches with her boss, alone or in a group setting, does not necessarily vitiate Cornejo's statement that she found his conduct offensive.

At bottom, incidents of alleged harassment need not be "particularly severe . . . to defeat summary judgment..." where "a reasonable juror, viewing the evidence in [plaintiff's] favor, could credit [plaintiff's] general allegation that she received fairly constant abuse for a period of...months and find that the incidents and derogatory comments, viewed in their totality, were sufficiently pervasive and that they unreasonably interfered with [plaintiff's] ability to do her job." *Pappas v. J.S.B. Holdings, Inc.*, 392 F.Supp.2d 1095, 1105 (D. Ariz. 2005) (footnote omitted) (denying employer's motion for summary judgment where plaintiff was subjected to hostile

environment for six months).  Cornejo has demonstrated that genuine issues of material fact preclude MauiSun's Cross-Motion for Partial Summary Judgment.

### E.    CORNEJO'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON HER RETALIATION CLAIM

Cornejo also moves for partial summary judgment on her claim that MauiSun retaliated against her for complaining about Dettloff's conduct to the ACRD.  To establish a *prima facie* case of retaliation, the plaintiff must show that (1) she engaged in a protected activity; (2) her employer subjected her to an adverse employment action[17]; and (3) a causal link exists between the protected activity and the adverse action.  *Ray,* 217 F.3d at 1240; *Brooks,* 229 F.3d at 928.  Thereafter, the burden of production shifts to the employer to present legitimate reasons for the adverse employment action.  *Brooks,* 229 F.3d at 928.  Once the employer meets this burden, the plaintiff must demonstrate that the reason advanced by the employer was pretext.  *Id.*  A plaintiff making a retaliation claim under Title VII "must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Medical Ctr. v. Nassar,__ U.S __, 133 S.Ct. 2517, 2533 (2013).  "[A]lthough the evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Villiarimo,* 281 F.3d at 1062 (quoting *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 143 (2000)).

With regard to causation, the Ninth Circuit has held that this element "may be established based on the timing of the relevant actions. Specifically, when adverse employment decisions are taken within a reasonable period of time after complaints of discrimination have been made, retaliatory intent may be inferred." *Passantino v. Johnson & Johnson Consumer Products, Inc.,* 212 F.3d 493, 507 (9th Cir. 2000) (citing

---

[17] The Ninth Circuit has adopted a broad interpretation of the meaning of "adverse employment action," which has been defined as adverse treatment that is reasonably likely to deter the employee from engaging in protected activity. *Ray v. Henderson,* 217 F.3d. at1234, 1237 (9th Cir. 2000).

1  *Yartzoff v. Thomas*, 809 F.2d 1371, 1375-76 (9th Cir. 1987) (finding causation based on

2  timing of retaliation); *Miller v. Fairchild Industries, Inc.*, 885 F.2d 498, 505 (9th

3  Cir.1989) (holding that discharges 42 and 59 days after EEOC hearings were sufficient to

4  establish *prima facie* case of causation)); *see also Stegall v. Citadel Broadcasting Co.*,

5  350 F.3d 1061, 1069 (9th Cir. 2003) (finding causation element satisfied where "a mere

6  nine days lapsed between [plaintiff's] complaints of discrimination  . . . and her

7  termination."). Moreover, the Ninth Circuit has also "held that evidence based on timing

8  can be sufficient to let the issue go to the jury, even in the face of alternative reasons

9  proffered by the defendant." *Passantino*, 212 F.3d at 507 (citing *Strother v. Southern

10  Calif. Permanente Medical Grp.*, 79 F.3d 859, 870-71 (9th Cir. 1996)).

11       In support of her argument for partial summary judgment, Cornejo relies heavily

12  on the timing of her termination, which occurred only 10 days after she informed Dettloff

13  that she and Sierra had complained about him to the ACRD. (*See* Doc. 214, pp. 9-10).

14  Cornejo also argues that when she was terminated, she was not given a reason why, and it

15  was only during the subsequent ACRD investigation that MauiSun cited the theft from

16  petty cash.

17       MauiSun points out that when Cornejo was disciplined, she had been informed

18  about the altered petty cash logs. (Doc. 216, p. 10 (citing Doc. 184, ¶O)). MauiSun's

19  submits Dettloff's ACRD declaration stating that during Cornejo's suspension it was

20  discovered, among other things, that petty cash logs indicated that she had stolen money

21  and her files were in disarray. (Doc. 184-1, Exh. 2, ¶¶8, 10; *see also id.* at ¶9).

22  Moreover, Cornejo concedes that $100 was missing, although she contends that Dettloff

23  had known about it and told her to "go ahead and change [the log]...." (Doc. 184-1, Exh.

24  6, p. 56).

25       Cornejo objects to the admissibility of MauiSun's petty cash logs and bank

26  statements. However, MauiSun, as the opponent to a summary judgment motion, does

27  not necessarily have to produce evidence in a form that would be admissible at trial, as

28  long as the it satisfies the requirements of Rule 56. *Celotex*, 477 U.S. at 324 ("We do not

mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment."). Cornejo does not argue that the documents "cannot be presented in a form that would be admissible in evidence." Fed.R.Civ.P. 56(c)(2).[18] MauiSun has stated a reason for its termination decision and in support has submitted copies of the documents such as the petty cash logs it contends Cornejo altered in order to hide her theft. (*See* Doc. 184, Exhs. 4, 7). Moreover, Cornejo has admitted that she changed the petty cash log with regard to the missing money. Cornjeo's protestations that the records were not changed to hide a theft and that Dettloff knew about the missing money and instructed her to change the logs are matters for the jury to consider and not for this Court to resolve on summary judgment.

Cornejo also argues that the ACRD's reasonable cause determination supports summary judgment in her favor. As discussed above with regard to Cornejo's sexual harassment claim, while the reasonable cause determination can be considered by the jury, MauiSun is entitled to present evidence refuting those findings. Here, MauiSun has presented sufficient evidence to create a material question of fact as to whether Cornejo's termination was retaliatory. Cornejo's motion is denied with regard to her retaliation claim.

## III. CONCLUSION

For the foregoing reasons, IT IS ORDERED that:

(1)    Plaintiff Cornejo's Motion for Partial Summary Judgment on Liability on Her Two Claims (Doc. 214) is DENIED;

(2)    Defendant MauiSun's Cross-Motion for Partial Summary Judgment (Doc.

---

[18] In this case, the documents may qualify as business records falling within the hearsay exception at Fed.R.Evid. 803(6). *See e.g. U-Haul Intern., Inc. v. Lumbermens Mut. Cas. Co*, 576 F.3d 1040, 1043-45 (9th Cir. 2009) (citations omitted). Further, Fed.R.Evid. 901 "states that for authentication there must be 'evidence sufficient to support a finding that the [item] . . . is what [the] . . .proponent claims [it is].'" *United States v. Workinger*, 90 F.3d 1409, 1415 (9th Cir 1996). "A document can be authenticated by the testimony of a witness with knowledge." *Id.* (citation omitted). The proponent of the evidence "need only make a prima facie showing of authenticity 'so that a reasonable juror could find in favor of authenticity or identification.'" *Id.* (quoting *United States v. Chu Kong Yin*, 935 F.2d 990, 996 (9th Cir.1991)).

216) is DENIED;

       (3)    the parties shall have until **OCTOBER 18, 2016** to file the Joint Proposed Pretrial Order.  In preparing their proposed order, the parties are directed to follow the format of the attached form of order;

       (4)    the final pretrial conference is SET for **OCTOBER 28, 2016 AT 10:00 A.M.**

       (5)    this matter is SET for jury trial to commence on **DECEMBER 6, 2016 AT 9:00 A.M.**

       Dated this 22nd day of September, 2016.

Bernardo P. Velasco
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| *, | No. CV-***-***-TUC-BPV |
| Plaintiff(s), | **ORDER** |
| v. | |
| *, | |
| Defendant(s). | |

**I.**
**Identification of Parties and Counsel**

**II.**
**Nature of Action**

**III.**
**Statement of Jurisdiction**

**IV.**
**Stipulations and Uncontested Facts**

**V.**
**Contested Issues of Fact**

The following are issues of fact to be tried and determined upon trial. Each issue of fact must be stated separately and in specific terms, followed by the parties' contentions as to each issue.

Issue:

Plaintiff(s) contends:

Defendant(s) contends:

## VI.
## Relevant Uncontested Issues of Law

(e.g. burdens of proof; standards of review)

## VII.
## Relevant Contested Issues of Law

The following are issues of law to be tried and determined upon trial. Each issue of law must be stated separately and in specific terms, followed by the parties' contentions as to each issue.

Issue:

Plaintiff(s) contends:

Defendant(s) contends:

## VIII.
## List of Witnesses

Each party shall provide a list of witnesses intended to be called at trial. Each witness shall be indicated as either fact or expert. A brief statement as to the testimony of each expert witness shall also be included.

## IX.
## List of Exhibits

Each party shall provide a list of numbered exhibits. A statement of either UNCONTESTED or CONTESTED shall follow each listed exhibit. If contested, a brief statement of the objection by the opposing party shall follow the listed exhibit.

(eg - 1. Laboratory Report from the Clinical Immunology Diagnostic Laboratory dated June 15, 2004. CONTESTED - Relevance, foundation and hearsay.)

**X.**
**List of Depositions**

Portions of depositions that will be read at trial must be listed by page and line number. A statement of either UNCONTESTED or CONTESTED shall follow. If contested, a brief statement of the objection by the opposing party shall follow the listed portion of the deposition to be offered.

**XI.**
**Jury Trial or Bench Trial**

The parties shall state whether the trial is a jury or bench trial.

For a Jury Trial

At the Pretrial Conference, the Court will direct the parties to file proposed voir dire, objections to exhibits, deposition testimony, stipulated jury instructions, stipulations, counsel's additional proposed jury instructions, motions in limine, and trial memoranda 20 days prior to trial. Any opposition shall be filed seven days thereafter.

For a Bench Trial

At the Pretrial Conference, the Court will direct the parties to file trial briefs, objections to exhibits, motions in limine, stipulations, and proposed findings of act and conclusions of law 20 days prior to trial. Any opposition shall be filed seven days thereafter.

**XII.**
**Probable Length of Trial**

Each party shall identify the estimated length of time it will take to present its case.

## XIII.
### Certification

The undersigned counsel for each of the parties in this action do hereby approve and certify the form and content of this proposed Joint Pretrial Order.

_____          _____
Attorney for Plaintiff(s)                          Attorney for Defendant(s)


This proposed Joint Pretrial Order is hereby approved as the Final Pretrial Order on this _____ day of _____, 20__.



                                         _____
                                              Bernardo P. Velasco
                                         United States Magistrate Judge